# No. 24-1302

# United States Court of Appeals
### for the
# Fourth Circuit

TOWERS WATSON & CO., now known as
WTW Delaware Holdings, LLC,

*Plaintiff-Appellant,*

— v. —

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA;
FEDERAL INSURANCE COMPANY; TRAVELERS CASUALTY AND
SURETY COMPANY OF AMERICA; LIBERTY INSURANCE
UNDERWRITERS, INC.; ALLIED WORLD NATIONAL ASSURANCE
COMPANY; IRONSHORE INDEMNITY INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

# OPENING BRIEF OF APPELLANT

ROBIN L. COHEN
ORRIE A. LEVY
ADAM S. ZIFFER
COHEN ZIFFER FRENCHMAN
  & MCKENNA LLP
1325 Avenue of Americas, 31st Floor
New York, New York 10019
(212) 584-1890

PAUL D. CLEMENT
ANDREW C. LAWRENCE
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, Virginia 22314
(202) 742-8900

MARLA DIAZ
WHITEFORD, TAYLOR
  & PRESTON, LLP
3190 Fairview Park Drive, Suite 800
Falls Church, Virginia 22042
(703) 280-9131

*Counsel for Plaintiff-Appellant*
*Towers Watson & Co.*

CP COUNSEL PRESS    (800) 4-APPEAL • (329307)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Plaintiff-Appellant Towers Watson & Co. n/k/a WTW Delaware Holdings LLC makes the following disclosure:

Towers Watson & Co. is not a publicly traded corporation or other publicly held entity. As part of a January 4, 2016 merger between Towers Watson & Co. and Willis Group Holdings plc, Towers Watson & Co. merged with and into WTW Delaware Holdings LLC, and no longer exists. WTW Delaware Holdings LLC is an indirect, wholly owned subsidiary of Willis Towers Watson plc, which is a publicly traded company.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES................................................................................ iv

INTRODUCTION ............................................................................................... 1

JURISDICTION.................................................................................................. 6

STATEMENT OF THE ISSUES ......................................................................... 6

STATEMENT OF THE CASE AND FACTS......................................................... 7

    A.    Historical and Legal Background.......................................................... 7

    B.    Factual Background..............................................................................11

           1.    Towers Watson Purchases Broad D&O Coverage That Specifically Includes the Defense *and Settlement* of Merger-Related Securities Litigation......................................11

           2.    Towers Watson Merges with Willis ....................................... 15

           3.    The Merger Results in Shareholder Litigation ........................ 16

           4.    The Insurers Refuse to Provide Indemnification .................... 20

    C.    Procedural Background ...................................................................... 21

SUMMARY OF ARGUMENT............................................................................ 25

STANDARD OF REVIEW ................................................................................ 28

ARGUMENT .................................................................................................... 29

I.    The District Court Erred In Holding That The Bump-Up Exclusion Relieves The Insurers Of Their Contractual Duty To Indemnify Towers Watson For The Settlements ............................................................ 29

A. The Insurers Cannot Establish That the Settlement in the Virginia Action Represents an Effective Increase in Deal Consideration for Towers Watson Shareholders—Because It Instead Represents the Difference in Share Price Had Shareholders Voted Down the Deal.................................................. 29

B. The District Court's Contrary Conclusion Is Plainly Wrong. ............ 40

C. Because Indemnification for the Settlement in the Virginia Action Exhausts the Policy's Remaining Coverage, The Court Need Not Address Whether Towers Watson Is Also Entitled to Indemnification for the Settlement in the Delaware Action .......... 47

II. At The Very Least, The District Court's Conclusion That The Bump-Up Exclusion Precludes Indemnification For Over $17 Million That Went Towards Attorneys' Fees Cannot Remain Standing............................ 47

CONCLUSION ...................................................................................................... 53

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Allstate Ins. Co. v. Gauthier*,
    641 S.E.2d 101 (Va. 2007)................................................................30

*Babcock & Wilcox Co. v. Areva NP, Inc.*,
    788 S.E.2d 237 (Va. 2016)...............................................................41

*Bartolomucci v. Fed. Ins. Co.*,
    770 S.E.2d 451 (Va. 2015) ..............................................................33

*Brundle ex rel. Constellis Emp. Stock Ownership Plan
    v. Wilmington Tr., N.A.*,
    919 F.3d 763 (4th Cir. 2019) .................................................... 48, 51

*CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*,
    566 F.3d 150 (4th Cir. 2009).......................................29-30, 34, 35, 41

*Ceradyne, Inc. v. RLI Ins. Co.*,
    2022 WL 16735360 (C.D. Cal. Oct. 31, 2022) ................................50

*Fusaro v. Howard*,
    19 F.4th 357 (4th Cir. 2021).............................................................28

*Golden Telecom, Inc. v. Glob. GT LP*,
    11 A.3d 214 (Del. 2010) ....................................................................8

*Gray v. Wesco Aircraft Holdings, Inc.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020) .............................................39

*Hill v. State Farm Mut. Auto. Ins. Co.*,
    375 S.E.2d 727 (Va. 1989)...............................................................46

*In re Appraisal of Towers Watson & Co.*,
    2017 WL 4156120 (Del. Ch. Sept. 18, 2017)..................................16

*In re Orchard Enters., Inc. S'holder Litig.*,
    88 A.3d 1 (Del. Ch. 2014) .................................................................9

*In re Resolute Energy Corp. Sec. Litig.*,
    2021 WL 327385 (D. Del. Feb. 1, 2021)...........................................8

*In re Towers Watson & Co. Stockholder Litig.*,
  C.A. No. 2018-0132-KSJM (Del. Ch. Apr. 2018)..............................................19

*In re Willis Towers Watson plc Proxy Litig.*,
  1:17-cv-1338-AJT-JFA (E.D. Va. Nov. 2017).....................................................16

*Interstate Fire & Cas. Co. v. Dimensions Assurance Ltd.*,
  843 F.3d 133 (4th Cir. 2016)......................................................... 30-31

*Karp v. First Conn. Bancorp, Inc.*,
  69 F.4th 223 (4th Cir. 2023) .........................................................8, 38

*Komatsu Mining Corp. v. Columbia Cas. Co.*,
  58 F.4th 305 (7th Cir. 2023) ...................................................... *passim*

*Liberty Univ., Inc. v. Citizens Ins. Co. of Am.*,
  792 F.3d 520 (4th Cir. 2015)...............................................................34

*Lockspeiser v. W. Md. Co.*,
  768 F.2d 558 (4th Cir. 1985) ..............................................................8

*Mack v. Resolute Energy Corp.*,
  2020 WL 1286175 (D. Del. Mar. 18, 2020) .......................................39

*Md. Cas. Co. v. Cole*,
  158 S.E. 873 (Va. 1931).......................................................................30

*Northrop Grumman Innovation Sys., Inc. v. Zurich Am. Ins. Co.*,
  2021 WL 347015 (Del. Super. Ct. Feb. 2, 2021) ...................11, 21, 44

*PBM Nutritionals, LLC v. Lexington Ins. Co.*,
  724 S.E.2d 707 (Va. 2012)......................................................... 30, 52

*Safeway Stores, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
  64 F.3d 1282 (9th Cir. 1995) ...............................................................49

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977)................................................................................39

*Sch. Bd. of City of Newport News v. Commonwealth*,
  689 S.E.2d 731 (Va. 2010).....................................................................29

*Seals v. Erie Ins. Exch.*,
   674 S.E.2d 860 (Va. 2009) ..................................................................46

*Sekhar v. United States*,
   570 U.S. 729 (2013) ..........................................................................37

*Smith v. Ramsey*,
   82 S.E. 189 (Va. 1914) ......................................................................41

*St. Paul Mercury Ins. Co. v. FDIC*,
   774 F.3d 702 (11th Cir. 2014) ...........................................................31

*Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
   67 F.4th 648 (4th Cir. 2023) ..............................................................21

*TravCo Ins. Co. v. Ward*,
   736 S.E.2d 321 (Va. 2012) ........................................................ 30, 32

## Statute and Regulation

15 U.S.C. §78n(a) ...................................................................................7

17 C.F.R. §240.14a-9(a) .......................................................................... 7

## Other Authorities

Barry Buchman & Michael Scanlon, *Avoiding Bumps in the Road to Coverage: Limitations on the "Bump-Up Exclusion,"* The D&O Diary (Dec. 28, 2021), https://rb.gy/0uidh0 ........................................9

Matthew D. Cain et al., *The Shifting Tides of Merger Litigation*,
   71 Vand. L. Rev. 603 (2018) ........................................................ 7, 45

Robert M. Daines & Olga Koumrian, *Recent Developments in Shareholder Litigation Involving Mergers and Acquisitions*, Cornerstone Rsch. (updated Mar. 2012), https://rb.gy/3ix2yd ..................... 7, 45

Jill E. Fisch et al., *Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and A Proposal for Reform*, 93 Tex. L. Rev. 557 (2015)............................................................... 16

Gil Isidro, *M&A Litigation: Bump-Up Exclusions Update*, Woodruff Sawyer (Jan. 12, 2022), https://rb.gy/922uvu ....................................10

Kevin LaCroix, *D&O Insurance Coverage and the Rise of Appraisal Litigation*, The D&O Diary (Oct. 11, 2017), https://rb.gy/ixdfme......................8

*Oxford English Dictionary* (online ed.) ..................................................................33

William G. Passannante & Raymond A. Mascia Jr., *Bumping the Bump-Up Exclusion: A Policyholder's Guide to Resisting Improper Coverage Denials*, N.Y. L.J. (Oct. 1, 2023), https://rb.gy/1fwkpd......................................................................10, 11

# INTRODUCTION

This insurance-coverage dispute is before the Court for the second time. Last year, the Court vacated and remanded on the ground that the district court failed to apply the ordinary meaning of the contract language at issue as Virginia law requires. Unfortunately, the decision on remand represents an even greater departure from ordinary meaning and common sense. The Court should reverse and make clear once and for all that the insurance companies here can no longer evade their coverage obligations.

This case concerns a request for indemnification by Towers Watson & Co. (Towers Watson) for settlements resolving shareholder suits filed after the 2015 merger between Towers Watson and Willis Group Holdings plc (Willis). For the 2015 policy year, Towers Watson paid substantial premiums to a group of insurers (Insurers) for $80 million in directors and officers (D&O) liability insurance coverage (the Policy), which generally required the Insurers to pay Towers Watson's defense and settlement costs in suits alleging wrongful acts committed by Towers Watson or its executives during the policy period—specifically including in cases involving alleged violations of the federal securities laws and alleged breaches of duty related to any merger transaction. There was nothing unusual about that coverage; shareholder suits are ubiquitous these days, especially in the context of

mergers, and meaningful D&O coverage is essential to attracting a qualified board that is not incentivized to spurn a promising merger for fear of litigation and liability.

It thus was all but inevitable that, in the years after the consummation of its merger with Willis, Towers Watson faced several shareholder suits. Two are relevant here: One suit in the Eastern District of Virginia (the Virginia Action) alleged violations of §14(a) of the Securities Exchange Act of 1934, while another in Delaware state court (the Delaware Action) alleged a breach of fiduciary duty. As often occurs in such litigation, the parties opted to settle. The Virginia Action settled for $75 million, and the Delaware Action settled for $15 million—with the plaintiffs' attorneys collecting over $17 million.

Towers Watson promptly sought coverage from the Insurers, and the Insurers promptly resisted providing the coverage that Towers Watson had paid for. Although the Insurers reimbursed Towers Watson's defense costs (which amounted to approximately $15 million), they categorically refused to indemnify Towers Watson for any portion of either settlement. According to the Insurers, those settlements fell entirely within the Policy's so-called "Bump-Up Exclusion," which is a common provision in D&O policies designed to prevent companies from financing corporate acquisitions with insurance proceeds. The Bump-Up Exclusion here provides: In the event of "[1] a Claim alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all

or substantially all the ownership interest in or assets of an entity is inadequate, [2] Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased."

Towers Watson filed suit seeking a declaration that the Bump-Up Exclusion is inapplicable here for multiple different reasons. The district court granted summary judgment to Towers Watson after concluding that the Towers Watson/Willis "merger" did not qualify as an "acquisition" under the Bump-Up Exclusion. But this Court later vacated and remanded, explaining that Virginia law—which governs the Policy—requires courts to apply plain meaning when interpreting insurance contracts and finding that an ordinary person would think that Willis acquired Towers Watson here. The Court emphasized, however, that it had left other critical issues unresolved, including the question of whether the $90 million in settlement money represented an effective increase in deal consideration, as opposed to representing some other measure of damages.

Faced with that issue on remand, the district court swung in the opposite direction and granted summary judgment to the Insurers. In the court's view, the Bump-Up Exclusion relieved the Insurers of their duty to indemnify Towers Watson for the settlements merely because the complaints in the Virginia and Delaware Actions contained allegations of inadequate deal consideration. More mystifying

still, the court held that even the $17+ million in court-ordered attorneys' fees unambiguously represented an effective bump-up in deal consideration—all based on an equitable doctrine known as the "common fund doctrine," which goes unmentioned in the Policy.

That decision is indefensible and cannot stand, as it renders crucial language in the Bump-Up Exclusion nugatory and is divorced from ordinary meaning and common sense. In reality, the operative question is what the settlements here "represent," not simply what the underlying complaints "allege." There is no way that the settlement in the Virginia Action represents an effective increase in deal consideration. Indeed, that action involved alleged violations of §14(a) of the Exchange Act, which regulates disclosures in proxy statements, and the plaintiff in that action calculated a single measure of damages that sought the very opposite of an effective increase in deal consideration. Specifically, the plaintiff pressed a damages theory premised on the proposition that, in a world with adequate disclosures, there would have been no merger or merger consideration at all, thereby prompting Towers Watson's stock to revert to its pre-merger price. The plaintiff thus sought backward-looking damages representing the harm to the value of their stock—*i.e.*, run-of-the-mill stock-drop damages—as opposed to forward-looking damages representing an increase in deal consideration based on Towers Watson's go-forward value or the consideration that they could have secured in the deal.

The reason why the plaintiff in the Virginia Action pursued that no-merger-no-consideration damages theory is obvious, as invoking §14(a) of the Exchange Act to seek an effective increase in deal consideration is not even a legally cognizable theory. To conclude that the settlement unambiguously represents an effective bump-up in deal consideration thus defies all logic. And once that much is recognized, there is no need to review the district court's (flawed) application of the Bump-Up Exclusion to the settlement in the Delaware Action, as indemnification for the $75 million settlement in the Virginia Action exhausts the approximately $54 million in remaining coverage.

At the very least, there is no denying that Towers Watson is entitled to indemnification for the $17+ million that it paid in attorneys' fees under the settlements. Those fees, which Towers Watson shareholders never received or controlled, cannot possibly represent an effective increase in deal consideration for those same shareholders. That would be obvious if the settlement expressly provided for an award to shareholders and a separate payment to Plaintiffs' attorneys to cover their fees. The district court adopted the contrary view by invoking the common-fund doctrine for awarding attorneys' fees. But nothing in the Policy mentions the common-fund doctrine, which underscores that the court's approach to attorneys' fees is impossible to square with this Court's admonition in this very case that courts applying Virginia contract law may not add terms to a contract or read

specialized meanings into contract language without any indication that the parties intended that result. And even if the common-fund doctrine applied, it favors Towers Watson, not the Insurers. This Court should reverse.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1332(a) because the amount in controversy in this case exceeds $75,000 and complete diversity exists between Towers Watson and the Insurers. That court entered final judgment in favor of the Insurers on March 6, 2024, *see* JA2963, and Towers Watson filed a timely notice of appeal on April 3, 2024, *see* JA2964. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that the $75 million settlement in the Virginia Action represents an effective increase in the consideration paid to Towers Watson shareholders as part of the Towers Watson/Willis merger, thereby triggering the Bump-Up Exclusion.

2. Whether, assuming that the Court answers the first question in the negative, the district court at least erred in holding that $17,626,730.78 that Towers Watson shareholders never actually received from the settlements in the Virginia and Delaware Actions, and that instead went towards attorneys' fees, nevertheless represents an effective increase in the consideration paid to Towers Watson

shareholders as part of the Towers Watson/Willis merger, also triggering the Bump-Up Exclusion.

## STATEMENT OF THE CASE AND FACTS

### A.     Historical and Legal Background

Shareholder litigation challenging mergers and acquisitions has skyrocketed in the 21st century.  "In recent years, over 96% of publicly announced mergers have attracted a shareholder lawsuit, with many mergers attracting suits in multiple jurisdictions."  Matthew D. Cain et al., *The Shifting Tides of Merger Litigation*, 71 Vand. L. Rev. 603, 604 (2018) ("Cain") (footnote omitted).   In such suits, shareholders "typically allege" that the target company "failed to maximize shareholder value."  Robert M. Daines & Olga Koumrian, *Recent Developments in Shareholder Litigation Involving Mergers and Acquisitions*, Cornerstone Rsch. 1 (updated Mar. 2012), https://rb.gy/3ix2yd ("Daines & Koumrian").

Merger objections seeking an effective increase in deal consideration, however, are not viable under §14(a) of the Exchange Act and its implementing regulations.  *See* 15 U.S.C. §78n(a); 17 C.F.R. §240.14a-9(a).  Under §14(a), which regulates proxy statements issued to shareholders, a plaintiff has a viable cause of action if he shows that (1) "the proxy statement contained a material misrepresentation or omission," (2) the misstatement or omission "proximately caused the plaintiff's economic loss," and (3) "the proxy solicitation was an essential

link in the accomplishment of the transaction." *Karp v. First Conn. Bancorp, Inc.*, 69 F.4th 223, 231, 234-35 (4th Cir. 2023). As courts have explained, "federal regulation is limited to disclosures," and the federal "securities laws cannot be used to contend that a corporate transaction did not fetch the best price." *Komatsu Mining Corp. v. Columbia Cas. Co.*, 58 F.4th 305, 307 (7th Cir. 2023); *see, e.g.*, *Lockspeiser v. W. Md. Co.*, 768 F.2d 558, 560-61 (4th Cir. 1985). Indeed, to say that "the stockholder could have received a better deal" would mean that the proximate cause of the harm is "*not*, as required by the law, the material misstatements," but rather the "failure to negotiate a better offer." *In re Resolute Energy Corp. Sec. Litig.*, 2021 WL 327385, at *3 (D. Del. Feb. 1, 2021) (emphasis added), *aff'd,* 2022 WL 260059 (3d Cir. Jan. 27, 2022).

By contrast, it is well-established that "price *is* a subject for appraisal and other remedies under state law." *Komatsu*, 58 F.4th at 307 (emphasis added). In appraisal actions, which are brought by shareholders who "vot[e] against a merger on the grounds that the consideration is inadequate," Kevin LaCroix, *D&O Insurance Coverage and the Rise of Appraisal Litigation*, The D&O Diary (Oct. 11, 2017), https://rb.gy/ixdfme, a state court determines the "fair value" of shares at the time that a merger closed, *see, e.g.*, *Golden Telecom, Inc. v. Glob. GT LP*, 11 A.3d 214, 217 (Del. 2010). Other price-related remedies under state law include remedies like "quasi-appraisal," in which a plaintiff alleges that "a fiduciary breache[d] its

duty of disclosure in connection with a transaction that requires a stockholder vote"—thereby precluding the exercise of appraisal rights—and seeks a "quantum of money equivalent to what a stockholder would have received in an appraisal." *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 42 (Del. Ch. 2014).

Regardless of whether objecting shareholders assert legally or factually valid claims when challenging a merger, defending against those suits is expensive and time-consuming for companies and their executives and boards. Accordingly, "to protect directors and officers from exposure to shareholder lawsuits stemming from merger and acquisition … activity," companies typically maintain D&O insurance policies, and "allegations of 'wrongful acts'" by executives of a target entity have historically "fall[en] within the 'breadbasket' of D&O coverage." Barry Buchman & Michael Scanlon, *Avoiding Bumps in the Road to Coverage: Limitations on the "Bump-Up Exclusion,"* The D&O Diary (Dec. 28, 2021), https://rb.gy/0uidh0. But as shareholder litigation has mounted, so too have claims under D&O policies, prompting insurers to develop strategies to try to cut back on coverage even as they collect growing premiums for coverage that is necessary to attract qualified boards who will not be unduly chilled in evaluating mergers and acquisitions.

The strategy *du jour* for insurers is to invoke a relatively longstanding and common provision in D&O policies known as a "bump-up exclusion." National Union Fire Insurance Company of Pittsburgh, PA (National Union) first introduced

the bump-up exclusion in 1995 and sought to address the "concern[] that a buyer in a corporate transaction could pay an unfairly low price for the acquisition of another company and then use its D&O insurance proceeds to supplement"—or bump up— "the purchase price by settling lawsuits brought by the selling shareholders." William G. Passannante & Raymond A. Mascia Jr., *Bumping the Bump-Up Exclusion: A Policyholder's Guide to Resisting Improper Coverage Denials*, N.Y. L.J. (Oct. 1, 2023), https://rb.gy/1fwkpd ("Passannante & Mascia"). In the intervening decades, D&O insurers of all stripes have included a "version" of the bump-up exclusion "in most D&O insurance policies." Gil Isidro, *M&A Litigation: Bump-Up Exclusions Update*, Woodruff Sawyer (Jan. 12, 2022), https://rb.gy/922uvu.

Critically, however, not all bump-up exclusions are created equal. Some bump-up exclusions are worded broadly and prevent companies from obtaining indemnification for payouts in merger-related suits so long as those suits merely "allege" inadequate deal consideration—even if the plaintiff asserted claims exclusively under the federal securities laws, which do not permit price-based objections to mergers in the first place. *See, e.g.*, *Komatsu*, 58 F.4th at 306-07. But the more common bump-up exclusions are "different," *id.* at 308, and require an insurer to prove not only that a complaint contains allegations of inadequate deal consideration, but also that any resulting settlement or judgment in fact represents

10

an effective increase in deal consideration—as opposed to some other form of compensatory relief, *see, e.g.*, *Northrop Grumman Innovation Sys., Inc. v. Zurich Am. Ins. Co.*, 2021 WL 347015, at *3 (Del. Super. Ct. Feb. 2, 2021). Ultimately, though, no matter the policy language, it is now "routine[]" for D&O insurers to "reflexively argue that the bump-up exclusion precludes coverage for any lawsuit following a corporate merger or similar transaction." Passannante & Mascia, *supra*.

**B.   Factual Background**

**1.   Towers Watson Purchases Broad D&O Coverage That Specifically Includes the Defense *and Settlement* of Merger-Related Securities Litigation.**

This dispute concerns insurance coverage for suits related to the 2015 merger of Towers Watson (then a publicly traded Virginia-based company) and Willis (then a publicly traded Ireland-based company). *See* JA717, JA719. Before completing that merger, Towers Watson purchased D&O insurance coverage from National Union—the creator of the original bump-up exclusion—for the 2015 policy year, which extended from January 1, 2015 through January 1, 2016. JA1401. Towers Watson also purchased additional D&O coverage from various other insurance companies under excess policies that "follow form" to the primary policy, meaning that they incorporate and adopt the terms, conditions, and definitions of the National

Union policy unless expressly stated otherwise.[1] JA718; *see* JA1516-1604. All told, Towers Watson purchased $80 million in D&O coverage from the Insurers—and paid hundreds of thousands of dollars in premiums.

As relevant here, the Policy states that the Insurers "shall pay the **Loss** of any **Organization** … arising from any **Securities Claim** made against such **Organization** for any **Wrongful Act** of such **Organization**" and "shall pay the **Loss** of an **Organization** that arises from any … **Claim** … made against any **Insured Person** … for any **Wrongful Act** of such **Insured Person**." JA1406. The bolded terms are explicitly defined elsewhere in the Policy.

"Securities Claim" is defined to include a "Claim … alleging a violation of any law, rule or regulation … which is … brought by a security holder … of an Organization with respect to such security holder's … interest in securities of such Organization," JA1430, JA1499, and "Claim" is in turn defined to include a "civil … proceeding for monetary … relief … commenced by … service of a complaint," JA1422, JA1495. "Wrongful Act" means "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, [or] omission." JA1431. "Organization" means Towers Watson and its subsidiaries, while "Insured Person"

---

[1] Consistent with this Court's prior decision in this case, this brief refers to the materially identical primary and excess policies at issue here collectively as the "Policy." JA718.

encompasses "any" "Executive" of those entities. *See* JA1406, JA1426-1428. And "Loss" is defined to include "Defense Costs" and "settlements." JA1426. Generally speaking, then, the Policy provides that the Insurers "shall pay" Towers Watson's defense and settlement costs in cases alleging so much as an "error" implicating Towers Watson or its executives, including in cases alleging violations of the federal securities laws and cases involving alleged breaches of duty.

Notably, moreover, the Policy expressly contemplates that both defense *and indemnity* coverage will exist for conduct relating to corporate mergers. As it explains, "[i]n the event of a **Transaction** during the **Policy Period**, this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**." JA1416. And the Policy defines a "Transaction" to include an event where Towers Watson "consolidat[es] with or merg[es] into another entity such that [Towers Watson] is not the surviving entity, or sell[s] all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert." JA1431; *see* JA1482.

While the Policy provides Towers Watson with robust insurance protection, including in the specific context of claims alleging merger-related violations of the federal securities laws or common-law duties, the Policy also contains the Bump-Up Exclusion at issue here, which explains that Towers Watson will not have a covered

"Loss" in certain narrow circumstances involving transaction-related litigation. In particular, the Bump-Up Exclusion provides the following:

> In the event of a Claim alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased; provided, however, that this paragraph shall not apply to Defense Costs[.]

JA1427. Thus, by its terms, the Bump-Up Exclusion does not allow the Insurers to deny indemnification merely because plaintiffs "allege" inadequate deal consideration. Instead, the Bump-Up Exclusion expressly distinguishes between *allegations*, which are relevant for judging whether a lawsuit is potentially subject to the exclusion, and settlement amounts that are excluded only to the extent that they *represent* effective increases in deal compensation. Specifically, the exclusion states that it applies *only* to the "amount" of the total settlement or judgment that "represent[s]" an "effective[] increase[]" in deal "consideration." To the extent that a suit alleging inadequate deal consideration results in a settlement that includes an amount representing an increase in effective deal consideration and an amount representing something else (*e.g.*, a different measure of damages), only the former is excluded. And in all events, Defense Costs are never excluded.

## 2. Towers Watson Merges with Willis.

In June 2015—midway through the Policy period—Towers Watson and Willis agreed to consummate an "all-stock merger of equals transaction." JA2236. As the market digested the announcement, the price of Towers Watson's common stock declined, while Willis' increased. *See* JA1630. But confident that the merger would ultimately "creat[e] a strong platform to deliver sustainable growth and substantial value for shareholders," Towers Watson proceeded with the merger and, in October 2015, sent its shareholders a "Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934," which provided a wealth of disclosures about the proposed merger in advance of a shareholder vote on it. JA2234, JA2236. In December 2015, a majority of Towers Watson shareholders voted in favor of the merger (as did nearly all Willis shareholders), and the transaction closed in January 2016, thus creating a new entity known today as Willis Towers Watson plc. *See* JA1656. As consideration for the deal, Towers Watson shareholders received the right to 2.649 shares of Willis stock for each of their (later cancelled) Towers Watson shares.[2] JA719-720.

---

[2] Towers Watson shareholders also received a pre-merger special dividend. *See* JA720 n.3.

### 3.    The Merger Results in Shareholder Litigation.

The Towers Watson/Willis merger proved no exception to the rule that "[s]hareholder litigation challenging corporate mergers is ubiquitous." Jill E. Fisch et al., *Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and A Proposal for Reform*, 93 Tex. L. Rev. 557, 557 (2015). In addition to facing an appraisal action in Delaware state court from certain Towers Watson shareholders who believed that they deserved increased consideration for their shares—a dispute that settled and that is not at issue in this appeal, *see In re Appraisal of Towers Watson & Co.*, 2017 WL 4156120 (Del. Ch. Sept. 18, 2017)— Towers Watson also faced two other suits that bear directly on this appeal.

In November 2017, former Towers Watson shareholders filed the Virginia Action—a putative class action in the Eastern District of Virginia against Towers Watson, its CEO (John Haley), and various other parties involved in the merger. *See In re Willis Towers Watson plc Proxy Litig.*, 1:17-cv-1338-AJT-JFA (E.D. Va.); JA1606. The lead plaintiff in the Virginia Action alleged that, in its proxy materials, Towers Watson failed to disclose that Haley would receive a large compensation package if the deal with Willis closed, which purportedly violated §14(a) of the Exchange Act. JA1611. As a result of this alleged conflict of interest, the lead plaintiff further alleged that Haley had agreed to a below-market valuation of Towers Watson, which purportedly caused Towers Watson "shareholders" to "accept[]

consideration from the merger that was well below fair value for their Towers shares." JA1611, JA1616.

But "[d]uring the course of the litigation"—and presumably cognizant that the "securities laws cannot be used to contend that a corporate transaction did not fetch the best price," *Komatsu*, 58 F.4th at 307—the lead plaintiff in the Virginia Action principally relied on a theory of damages that had no relation at all to the price or consideration that Towers Watson shareholders purportedly should (or could) have received for their shares in the merger. JA690. As the damages expert for the lead plaintiff explained in his July 2020 expert report, the "theory of liability is that had a full disclosure been made, the *most likely* outcome is that the Towers shareholders would have *voted down the merger* and that there would have been no possibility of a new, more generous offer by Willis." JA1697 (emphases added); *see also* JA1698 ("Given the materiality of the relevant undisclosed information, there is a reasonable likelihood that the merger would not have been approved by Towers shareholders had proper disclosures been made."). "[O]nce the deal was voted down following a full disclosure of the conflict and no new proposal was put forth," the expert continued, "the market would have anticipated management of the two companies to return to their independent stand-alone values with no further merger overhang, increasing the stock prices of the two companies." JA1699. The lead plaintiff thus pressed "a 'price reversion theory' that measured damages by the difference between

what shareholders actually received from the merger and what the market price of their shares would have been had adequate disclosures been made, which would have caused the merger to be voted down." JA2958. Simply put, this backward-looking theory measured the harm to Towers Watson's stock price caused by the announcement of the merger and related events—irrespective of the adequacy of the deal consideration—rather than by Towers Watson's purported true value at the time of the merger.

In two short paragraphs at the very end of his report, the lead plaintiff's damages expert also attempted to offer an "alternative" method of calculating damages. JA1701. This alternative method endeavored to assess "the results of a hypothetical renegotiation of the merger agreement had a full disclosure of the information … been made." JA1701. But the expert conceded that "one cannot precisely determine what the results of such a hypothetical negotiation would be"— *viz.*, what (if any) increased consideration Towers Watson shareholders would have received—so he ultimately posited only that "Towers shareholders would not have been expected to support any deal that would have given them less than what they would have received in the absence of a merger," which is the figure that he calculated for his primary theory that assumed that no deal would have occurred in the but-for world. JA1702. As the expert therefore emphasized in his August 2020

rebuttal report, this speculative "merger-consideration analysis" served only as a "secondary" theory of damages.  JA426 (capitalization altered).

A short time after the release of those expert reports, in November 2020, the parties settled the Virginia Action for $75 million.  *See* JA1844.  Of that amount, the attorneys representing the putative class pocketed $13,658,540.74, leaving Towers Watson shareholders with $61,341,459.26 to distribute amongst themselves.  *See* JA1991-1992.  Judge Trenga—who presided over the Virginia Action—approved the settlement in May 2021.  *See* JA1980, JA1991.

Apart from the Virginia Action, Towers Watson also faced separate, state-law litigation in the Delaware Court of Chancery—the Delaware Action—beginning in April 2018.  The Delaware Action involved three consolidated shareholder actions that asserted state-law claims for breach of fiduciary duty (and aiding and abetting the same) against Haley, other members of the Towers Watson board of directors, and certain other persons.  *See In re Towers Watson & Co. Stockholder Litig.*, C.A. No. 2018-0132-KSJM (Del. Ch.).  But in November 2020, before the plaintiffs in the Delaware Action fully formulated their theory of damages—*e.g.*, quasi-appraisal damages, another form of bump-up damages, or something else altogether—the parties settled the dispute for $15 million.  *See* JA2002.  As in the Virginia Action, Towers Watson shareholders ultimately received only a fraction of that amount: Their attorneys collected $3.75 million in fees, and another $218,190.04 went

toward litigation-related expenses, leaving shareholders with just over $11 million. *See* JA1356. The Delaware court approved that settlement in June 2021. *See* JA1346.

### 4. The Insurers Refuse to Provide Indemnification.

Towers Watson promptly informed the Insurers of the Virginia and Delaware Actions so that it could recover defense and settlement costs under the Policy. *See* JA2230-2231. Although the Insurers agreed (as required) to fund Towers Watson's defense costs—which consumed approximately $15 million of Towers Watson's $80 million of coverage, *see* JA2921—they categorically refused to provide any indemnification. According to the Insurers, merely because the plaintiffs in the Virginia and Delaware Actions "*allege[d]* that the price or consideration paid to the Towers shareholders in connection with the proposed transaction was inadequate," the Bump-Up Exclusion applies, and "coverage … is limited to the payment of Defense Costs." JA2194 (emphasis added); *see also, e.g.*, JA2201 ("[S]ince the fundamental premise of the claims … is that the plaintiffs did not receive adequate consideration for their Towers Watson shares, it necessarily follows that the relief sought by plaintiffs constitutes an effective increase of such consideration; that such amounts are specifically excluded from the definition of 'Loss'; and that coverage is therefore limited to an allocated amount of 'Defense Costs.'"); JA2207, JA2211, JA2214, JA2221, JA2227.

### C. Procedural Background

1.     Towers Watson commenced this action in 2020 seeking a declaration that that the Bump-Up Exclusion does not foreclose indemnification.  *See* JA26. Shortly after filing suit, Towers Watson moved for partial summary judgment, asserting that the Bump-Up Exclusion does not apply for multiple independent reasons.  *See* JA49.  Among other things, Towers Watson asserted that the Bump-Up Exclusion is not triggered because (1) that exclusion requires the existence of a claim alleging inadequate consideration paid for the "acquisition" of an entity, and the "merger of equals" involving Towers Watson and Willis did not qualify as an "acquisition," as other courts had concluded in similar circumstances, JA75; *see Northrop*, 2021 WL 347015, at *21, and (2) the Insurers could not establish that the settlements in the Virginia and Delaware Actions actually represented an effective increase in deal consideration, as opposed to some other form of compensatory relief, JA82-83.  In an October 2021 decision, Judge Trenga—who, in addition to presiding over the Virginia Action, also presided over this case—agreed with Towers Watson on the first argument, obviating the need to reach the second.  *See* JA684.

2.     This Court reversed on appeal in May 2023.  *See Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 67 F.4th 648 (4th Cir. 2023); JA715.  The Court began by explaining that the Policy is governed by Virginia law, which treats

an insurance policy like any other contract, so "the words used are given their ordinary and customary meaning when they are susceptible of such construction." JA723 (citation omitted). The Court also stated that "ambiguous" policy language— where "'competing interpretations'" of the language "are 'equally possible'"— "must be resolved against the policy's drafter, which 'is almost always the insurer,'" and that "[t]his *contra proferentem* rule applies with particular force in cases involving the construction of coverage exclusions, where the insurer has the burden to prove that an exclusion applies." JA723-724 (citation omitted).

Applying those principles, the Court concluded that the district court erred in granting summary judgment to Towers Watson because an "ordinary person" would conclude that Willis "acquired" Towers Watson—*i.e.*, "obtained 'possession' or 'control' of … the equity ownership interest in Towers Watson" and "all of Towers Watson's assets." JA726-727 (emphasis omitted). But the Court took pains to characterize that decision as "narrow," and it emphasized that it "does not resolve the ultimate question whether the bump-up exclusion bars indemnity coverage to Towers Watson for the underlying settlements." JA732. The Court therefore remanded the case to the court below to resolve all remaining issues, including Towers Watson's argument that "the underlying settlements don't represent an effective increase in consideration for the original Towers Watson shares." JA732.

3.     On remand, Towers Watson again moved for summary judgment, asserting that the Insurers could not demonstrate—as they are required—that the settlements in the Virginia and Delaware Actions represent an effective increase in deal consideration, while further contending that at least the $17+ million in attorneys' fees self-evidently do not represent such an increase.  *See* JA1361-1393. The Insurers cross-moved for summary judgment.  *See* JA737.  This time, the district court ruled in favor of the Insurers.  *See* JA2946-2962.[3]

As to the Virginia Action, although the district court had previously recognized that the principal theory of damages offered by the lead plaintiff there— "the difference between what the Tower[s] Watson shareholders received and what the value of their stock would have been absent a merger"—"ha[d] nothing to do with" deal consideration, JA578, and although the court previously made clear that the lead plaintiff in the Virginia Action could never have stated a viable inadequate-consideration claim under §14(a) of the Exchange Act, *see* JA531 ("[I]f the [Virginia Action] plaintiffs said, 'We are suing – we allege, pursuant to Section 14(a), that as a result of the merger or acquisition, Towers Watson shareholders receive inadequate consideration,' that case would have been dismissed."), it nevertheless held on

---

[3] The Insurers also cross-moved on another issue—that Towers Watson is an "entity" under the Bump-Up Exclusion.  The district court granted summary judgment to the Insurers on that issue, *see* JA2955-2957, which is not at issue in this appeal.

remand that the settlement in the Virginia Action "represent[s]" an "amount[] that 'effectively increased' the consideration for the merger, such that the [Bump-Up] Exclusion unambiguously applies." JA2960 (citing *Komatsu*, 58 F.4th at 308). According to the court, it sufficed that the "allegations of harm" in the complaint "were solely predicated on the theory that shareholders got less in the merger than Towers Watson was worth." JA2959-2960. While the court left open the possibility that it might reach "[a] different result … in a case in which multiple legal claims with distinct theories of harm are settled at once, such as cases involving claims of separate violations of Section 14(a) and Section 10(b)" of the Exchange Act, it found such nuanced analysis irrelevant in this case given that "the underlying claims" here "only alleged harm due to inadequate consideration because of the merger." JA2960 n.18. The court also found its conclusion reinforced by the term "paid" in the Policy, which "contemplates that the Exclusion could apply to amounts distributed *after* the merger consideration, identified as such, has already been 'paid.'" JA2960.

Based on this allegations-driven understanding of the Bump-Up Exclusion, the district court also held that indemnification is "unambiguously" not required for the settlement in the Delaware Action. *See* JA2957-2960. And the court further held that the Bump-Up Exclusion precludes coverage even for the $17+ million in attorneys' fees that Towers Watson shareholders never actually pocketed. *See* JA2960-2961. In reaching the latter conclusion, the court relied on the so-called

"common fund doctrine," a specialized equitable doctrine never mentioned in the Policy that requires non-paying plaintiffs to pay their own litigation expenses. JA2961. In the court's view, "[r]egardless of how the additional consideration is distributed once it is paid to the beneficiaries, it nevertheless constitutes *in toto* an increase in the consideration paid for the merger." JA2961.

## SUMMARY OF ARGUMENT

Virginia law is clear that the Insurers bear the burden of proving that the Bump-Up Exclusion unambiguously bars indemnification for all the settlement money that Towers Watson paid in the Virginia and Delaware Actions. The Insurers come nowhere close to meeting their burden. The Bump-Up Exclusion requires Insurers to establish two elements: (1) the existence of a claim *alleging* inadequate deal consideration and (2) proof that the excluded amount of the settlement in fact *represents* an effective increase in deal consideration. The use of different terms in those two elements is unmistakable and consequential. While allegations may be enough to satisfy the first element—and make the suit an eligible suit—they are decidedly insufficient for the second. Even in the universe of suits alleging inadequate deal compensation, only the amounts of awards and settlements representing additional deal consideration satisfy the exclusion. The district court's decision conflates those two elements, not to mention two distinct words, and runs afoul of common sense to boot. The decision cannot stand.

This should have been a straightforward case because the settlement in the Virginia Action clearly does not represent an effective increase in deal consideration; indeed, it could not. Federal law precludes an effective increase in deal consideration as a measure of damages under §14(a) of the Exchange Act. Thus, regardless of what the suit alleges, which of course is entirely in the control of the plaintiff and limited only by the outer boundaries of Rule 11, the settlement plainly represented something quite different. Indeed, the Virginia Action settled hot on the heels of the lead plaintiff pressing a damages theory that assumed that no deal would have occurred (and shareholders never would have received any deal consideration) absent the alleged violations of §14(a) of the Exchange Act and seeking run-of-the-mill stock-drop damages. Unsurprisingly, once the lead plaintiff moved from making mere allegations to being constrained by well-established law, its expert report reflected the reality that §14(a) is not a legitimate tool for seeking an effective increase in deal consideration.

The district court arrived at its contrary conclusion merely because the complaint in the Virginia Action included allegations of inadequate consideration. But, as noted, that misreads the plain text of the Policy, which distinguishes between mere allegations and what the settlement actually represents. Thus, even without resort to principles of *contra proferentem* and common sense, the decision below is plainly wrong based on the plain text. In addition, Virginia law requires courts to

give effect to all contract terms, and the court's embrace of an allegations-are-dispositive reading of the Bump-Up Exclusion renders critical language in the exclusion superfluous.  It also expands the Bump-Up Exclusion to a point where it renders D&O indemnity coverage largely illusory in the context of corporate mergers and acquisitions, and it makes the reality of the viable claims and what the settlement amounts actually represent wholly irrelevant.  The court below plainly erred in excluding coverage for the Virginia Action based on the Bump-Up Exclusion.

Because Towers Watson is entitled to indemnification for the settlement in the Virginia Action, there is no need for this Court to address the settlement in the Delaware Action.  There is only approximately $54 million in coverage remaining under the Policy,[4] and the Virginia Action settled for $75 million.  Regardless, the district court's application of the Bump-Up Exclusion to the settlement in the Delaware Action is equally deficient, as the court applied the same misguided one-step analysis and conflation of allegations and what amounts represent that it did when analyzing the Virginia Action.

---

[4] While the Insurers paid approximately $15 million in defense costs, Towers Watson also reached a separate settlement that reduced the remaining coverage to approximately $54 million.

At a bare minimum, however, Towers Watson is entitled to indemnification for the $17+ million in settlement money that went toward attorneys' fees. To state the obvious, that amount does not represent an effective increase in deal consideration for Towers Watson shareholders; it represents a payout to attorneys for fees in pursuing the litigation. All of that would have been undeniable had the settlement itself specified an amount payable to the class and a separate amount payable to class counsel. The district court reached a contrary conclusion by invoking the common fund doctrine and reading specialized meanings into the contract terms—precisely what this Court instructed the court not to do the last time around. In all events, applying the common fund doctrine here does not even help the Insurers. That doctrine presupposes that, absent the payment of attorneys' fees, non-paying plaintiffs would be unjustly enriched. Amounts to which shareholders are not entitled because they would be unjustly enriched cannot possibly represent an effective increase in deal consideration to those shareholders.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's disposition of cross-motions for summary judgment." *Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021).

# ARGUMENT

## I. The District Court Erred In Holding That The Bump-Up Exclusion Relieves The Insurers Of Their Contractual Duty To Indemnify Towers Watson For The Settlements.

In its prior decision in this case, this Court left unresolved the ultimate question of whether the Bump-Up Exclusion prevents Towers Watson from obtaining indemnification for the settlements in the Virginia and Delaware Action. *See* JA732. The answer to that question is plainly no when it comes to the settlement in the Virginia Action, and the district court's contrary conclusion is wrong at every turn. Because indemnification for the Virginia Action exhausts the Policy's remaining coverage, the Court need not resolve whether Towers Watson is also entitled to indemnification for the settlement in the Delaware Action.

### A. The Insurers Cannot Establish That the Settlement in the Virginia Action Represents an Effective Increase in Deal Consideration for Towers Watson Shareholders—Because It Instead Represents the Difference in Share Price Had Shareholders Voted Down the Deal.

As this Court recognized last year, the Policy is governed by Virginia law because Towers Watson and the Insurers formed the contract in that state. *See* JA723. Under Virginia law, "[a]n insurance policy is a contract, and, as in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction." *Sch. Bd. of City of Newport News v. Commonwealth*, 689 S.E.2d 731, 735 (Va. 2010). That analytical process often involves consulting dictionaries. *See, e.g., CACI Int'l, Inc. v. St. Paul*

*Fire & Marine Ins. Co.*, 566 F.3d 150, 158 (4th Cir. 2009). And courts must discern ordinary meaning with respect to *all* words in an insurance policy: "No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012).

While plain text controls, Virginia law is "solicitous of insureds" as a general matter, *CACI*, 566 F.3d at 155, particularly in the context of "exclusions" in insurance policies. Although "[t]he burden is upon the policyholder to bring himself within the terms of the policy" in the first instance, *Md. Cas. Co. v. Cole*, 158 S.E. 873, 876 (Va. 1931), the Virginia Supreme Court has "long held that the burden is upon the insurer to prove that an exclusion of coverage applies," *TravCo*, 736 S.E.2d at 325. Furthermore, where exclusionary language is "ambiguous" and two interpretations are "equally possible," the interpretation that is "most favorable to the insured will be adopted," *PBM Nutritionals, LLC v. Lexington Ins. Co.*, 724 S.E.2d 707, 713 (Va. 2012) (citation omitted). In other words, "[e]xclusions in insurance policies must be read narrowly in favor of coverage." *Allstate Ins. Co. v. Gauthier*, 641 S.E.2d 101, 104 (Va. 2007); *see also* JA729 (this Court referencing "[t]he general principle that exclusions must be narrowly construed"). That principle applies with particular force when the insurer's reading of an exclusion would render the policy's promise of coverage illusory. *See, e.g., Interstate Fire & Cas. Co. v.*

*Dimensions Assurance Ltd.*, 843 F.3d 133, 144-45 (4th Cir. 2016); *St. Paul Mercury Ins. Co. v. FDIC*, 774 F.3d 702, 709 (11th Cir. 2014). Such overbroad readings not only amount to a bait-and-switch on the insured, but also violate basic principles of construction, as one does not go to the trouble of providing coverage for settlements of litigation arising out of mergers and acquisitions only to exclude all or virtually all such coverage.

Those longstanding principles make the question of whether Towers Watson is contractually entitled to indemnification for the settlement in the Virginia Action easy. The Policy at issue here—for which Towers Watson paid the Insurers hundreds of thousands of dollars in premiums—establishes a default rule that the Insurers "shall pay" Towers Watson's "settlement" costs in any case in which a Towers Watson "security holder" "alleg[es]" that Towers Watson or its executives violated "any law, rule, or regulation … with respect to such security holder's … interest in securities of [Towers Watson]." JA1406, JA1426-1427, JA1430, JA1499. That describes the Virginia Action to a tee. As the Insurers explained below, Towers Watson's former "shareholders" brought the Virginia Action and "alleged" that "TW and its then-CEO John Haley violated Securities Exchange Act Section 14(a) because the proxy materials omitted the fact that Haley would receive a compensation package of up to $165 million if the transaction closed." JA2600. It is thus beyond all reasonable debate that Towers Watson is entitled to

indemnification for the $75 million settlement in the Virginia Action—at least until the approximately $54 million in remaining coverage is exhausted—*unless* the Insurers can carry their heavy "burden" of proving that the Bump-Up Exclusion clearly and unambiguously compels a contrary result. *TravCo*, 736 S.E.2d at 325.

The Insurers cannot meet their burden. As noted, the Bump-Up Exclusion states:

> In the event of a Claim alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased[.]

JA1427. The Bump-Up Exclusion therefore "sets out two conditions"—neatly separated into two clauses using materially different language—"that must be fulfilled before it bars coverage: (1) there must be a Claim alleging that consideration for an acquisition was inadequate, and (2) only that amount of a judgment or settlement is excluded which represents the amount by which such consideration is effectively increased." JA2953.

The first element, like the initial coverage determination, focuses on what the plaintiff alleges. But that element simply identifies the universe of claims for which some amount of the ultimate settlement or judgment may be excluded. For purposes of that threshold question, it may be fair to look only to the allegations of the complaint, which are entirely within the control of a plaintiff who has every

incentive to over-allege at the complaint stage. But the second element plainly goes beyond mere allegations and looks to what the settlement or judgment amounts actually represent. Here, the Court can take the first condition as a given (regarding what the Virginia Action alleged), because the Insurers plainly cannot satisfy the second (regarding what the Virginia Action settlement actually represents).

The second element of the Bump-Up Exclusion does not focus on the allegations of the complaint, but looks to the opposite end of the litigation, after allegations have been tested in early rounds of the litigation and modified in light of potential defenses or legal obstacles and resulted in a judgment or settlement. At that stage, the exclusion uses very different language—looking not to "allegations" but to what "amounts" actually "represent." Basic rules of construction demand that those different terms have different meanings, *see Bartolomucci v. Fed. Ins. Co.*, 770 S.E.2d 451, 456 (Va. 2015) ("This distinction based upon the word choice utilized in the instrument must be recognized because 'all words used in the written instrument must be given effect if reasonably possible.'" (brackets omitted)), and the ordinary meaning of "represent" in this context is "symbolize," "signify," or "constitute," Represent, *Oxford English Dictionary* (online ed.).

That ordinary meaning is reinforced by the surrounding text. The second element excludes only the "amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased." It thus

contemplates the possibility that a settlement or judgment in a case alleging inadequate deal consideration could result in a judgment or settlement where only a portion of the judgment or settlement (or none of it) represents an effective increase in deal consideration. Other amounts are not excluded, and in deciding what amounts are excluded, the second element goes well beyond allegations and looks to the reality of what the settlement or judgment amounts actually represent.

That distinction between what the complaint alleges and what the settlement or judgment actually represents mirrors a well-established dichotomy in Virginia law. Under Virginia law, whereas an insurer's "duty to *defend* is based on the allegations in the underlying complaint, the duty to *indemnify* relies on litigated facts." *CACI*, 566 F.3d at 155 (emphases added); *see Liberty Univ., Inc. v. Citizens Ins. Co. of Am.*, 792 F.3d 520, 528 (4th Cir. 2015). Thus, when an insured settles a case and an insurer invokes an exclusion in response, it is imperative that courts focus on what actually happened in the litigation at the end—not what plaintiffs simply alleged at the beginning—to determine whether indemnification is required or not. As noted, the two elements of the Bump-Up Exclusion mirror this distinction, with the universe of potentially relevant claims judged by the allegations, and the actual indemnification obligations judged by what the amounts paid to settle a case or discharge a judgment actually represent.

Hence, in a case alleging that Towers Watson shareholders received inadequate deal consideration that culminates in a settlement, the Bump-Up Exclusion excludes coverage *only* as to that part (if any) of the settlement that symbolizes the amount by which the deal consideration is effectively increased. In context, the word "effectively" does not substantially expand the exclusion but simply acknowledges that the deal consideration is not actually increased by a post hoc settlement or judgment because the parties already consummated the deal and the actual negotiated consideration already changed hands.

Once one moves beyond mere allegations, the Insurers cannot demonstrate that the amounts paid in settlement of the Virginia Action represent an effective increase in deal consideration, as opposed to a different form of compensatory relief. The "litigated facts" and history of the Virginia Action vividly illustrate the point. *CACI*, 566 F.3d at 155. Indeed, as the litigation moved beyond the allegations of the complaint, the lead plaintiff in the Virginia Action never seriously sought an effective increase in deal consideration as relief. To the contrary, the lead plaintiff adamantly insisted that, in the absence of any violation of §14(a) of the Exchange Act, the Towers Watson/Willis deal would *never* have occurred, and shareholders *never* would have received any deal consideration *at all*. The lead plaintiff's handpicked expert said so himself just months before the case settled: "Plaintiff's theory of liability is that had a full disclosure been made, the most likely outcome is

35

that the Towers shareholders would have voted down the merger and that there would have been no possibility of a new, more generous offer by Willis."[5]  JA1697. Thus, far from requesting an effective increase in consideration for a deal that the lead plaintiff itself believed would never had transpired in a world without the alleged §14(a) violations, it instead asserted a stock-price-reversion theory that measured damages simply by "revers[ing]" the price movements of Towers Watson's stock and "return[ing]" the price to its pre-merger level "with no further merger overhang."  JA1689, JA1699.

Put differently, the plaintiff sought run-of-the-mill, out-of-pocket stock-drop damages representing the harm to the value of Towers Watson stock as a result of the merger announcement and related, pre-closing events, theorizing that full disclosure and subsequent rejection of the merger would have reversed those price movements.  Against that background, the notion that the settlement in the Virginia Action unambiguously constitutes an actual though unofficial increase in deal

---

[5] *See also, e.g.*, JA690 (district court stating:  "During the course of the [Virginia Action], Lead Plaintiff … advanced a theory of 'out of pocket" damages based on the assumption that upon fulsome disclosure … , the Towers Watson stockholders would have voted against the Merger, the two companies would have gone their separate ways, and the price of the publicly traded Towers Watson stock would have 'reverted' back to its publicly traded price immediately before the announcement of the Merger on June 30, 2015.").

consideration "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013).

That straightforward conclusion is reinforced by the reality that the lead plaintiff in the Virginia Action expressly considered seeking an effective increase in deal consideration as the measure of damages but affirmatively relegated that theory to "secondary" status. JA426. Indeed, after devoting the bulk of his report to calculating damages associated with the "most likely" scenario of no Towers Watson/Willis deal and thus no deal consideration, the lead plaintiff's expert explicitly (though very briefly) considered "[a]n alternative measure of damages … based on the results of a hypothetical renegotiation of the merger agreement had a full disclosure of the information that Lead Plaintiff alleges was improperly omitted or misrepresented been made." JA1701. But the expert did not even deign to calculate this alternative measure of damages. Instead, he readily admitted that he "cannot precisely determine what the results of such a hypothetical negotiation would be" before making the common-sense point that "Towers shareholders would not have been expected to support any deal that would have given them less than what they would have received in the absence of a merger." JA1702. That alternative damages theory thus succeeded only in confirming that the no-deal-no-consideration stock-price-reversion theory drove the damages claim in the Virginia Action all along.

And the problems run deeper. As the lead plaintiff's expert elsewhere acknowledged, the only available evidence in the record in the Virginia Action indicated that the supposedly inadequate offer that Towers Watson accepted represented Willis' "best and final offer." JA1698-1699. In other circumstances where §14(a) plaintiffs failed to muster any support for the proposition that shareholders could have obtained a better deal in a but-for world with complete disclosures, this Court has had no trouble rejecting their claims for failure to establish the necessary loss-causation element of a §14(a) claim. *See, e.g.*, *Karp*, 69 F.4th at 235 ("Karp doesn't suggest that the shareholders missed out on 'a viable superior offer' by approving the merger. On the contrary, People's was 'willing to walk' if First Connecticut rejected the $32.33 offer, and no other offer was on the table." (citation omitted)). That makes it even more bizarre to characterize the settlement in the Virginia Action as unambiguously representing an effective bump-up in deal consideration.

In the end, it is no mystery why the lead plaintiff in the Virginia Action did not meaningfully pursue a bump-up in deal consideration as the measure of damages. That action solely involved alleged violations of the federal securities laws, and it is well-established that those laws "cannot be used to contend that a corporate transaction did not fetch the best price," as "federal regulation is limited to disclosures, while price is a subject for appraisal and other remedies under state law."

*Komatsu*, 58 F.4th at 307.[6]  In fact, even the district court below acknowledged as much.  *See* JA531 ("[I]f the [Virginia Action] plaintiffs said, 'We are suing – we allege, pursuant to Section 14(a), that as a result of the merger or acquisition, Towers Watson shareholders receive inadequate consideration,' that case would have been dismissed.").

Consistent with this conclusion, the notice to the class members who recovered under the settlement *nowhere* described the Virginia Action as seeking an increase in deal consideration.  Nor did it describe the settlement as representing an effective increase in deal consideration to recovering shareholders.  To the contrary, the section of the notice titled "What is This Litigation About?" described the Virginia Action as a lawsuit seeking damages for alleged disclosure violations under federal law.  JA1911.

---

[6] *See, e.g.*, *Mack v. Resolute Energy Corp.*, 2020 WL 1286175, at *11 (D. Del. Mar. 18, 2020) ("In the context of [§14(a) of the Securities Exchange Act], a plaintiff cannot say that the merger consideration should have been greater than it was, and that shortfall is the measure of the harm[.]"); *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 404-07 (S.D.N.Y. 2020) (similar), *aff'd,* 847 F. App'x 35 (2d Cir. 2021); *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden.").

The litigated facts of this case thus make crystal clear that the settlement in the Virginia Action does not even arguably—much less unambiguously—represent an effective increase in deal consideration. The law forecloses such relief as a remedy for a §14(a) violation, which readily explains why the plaintiff never meaningfully pursued it.[7] That reality underscores the wisdom of looking beyond mere allegations—which are entirely in the control of a plaintiff with every incentive to over-allege—to what settlement or judgment amounts actually represent once the plaintiffs have had to confront the reality of litigation and well-established limits on recovery of additional deal consideration for certain claims. In short, Towers Watson did not pay $75 million to settle a non-viable bump-up theory of damages that the plaintiff never meaningfully pressed in the Virginia Action.

## B. The District Court's Contrary Conclusion Is Plainly Wrong.

The district court's contrary reasoning is unpersuasive. The court held that, because the "*allegations*" in the complaint in the Virginia Action "were solely predicated on the theory that shareholders got less in the merger than Towers Watson was worth," the Bump-Up Exclusion "unambiguously applies" and precludes Towers Watson from receiving indemnification for the entire $75 million settlement. JA2959-2960 (emphasis added). That reasoning flouts elementary rules of Virginia

---

[7] In all events, even if doubt existed about the meaning of the Bump-Up Exclusion and its application, this Court must resolve it in Towers Watson's favor, consistent with "[t]he general principle that exclusions must be narrowly construed." JA729.

contract law.  As the Virginia Supreme Court has repeatedly instructed, in interpreting contracts, different words are presumed to have different meanings, *see, e.g.*, *Smith v. Ramsey*, 82 S.E. 189, 191 (Va. 1914), and "[e]ffect should be given to every part of the instrument, if possible, and no part thereof should be discarded as superfluous or meaningless," *Babcock & Wilcox Co. v. Areva NP, Inc.*, 788 S.E.2d 237, 254 n.32 (Va. 2016).

The interpretation embraced below violates those cannons by conflating the meaning of "alleged" and "represents" and introducing just that sort of disfavored superfluity.  As noted, the Bump-Up Exclusion requires the Insurers to establish *two* conditions before they can apply it to an otherwise-covered insurance claim: (1) they must establish the existence of a claim *alleging* inadequate deal consideration, and (2) they must establish that the amount of any judgment or settlement of that claim that *represents* an effective increase in deal consideration. *See* JA1427.  The decision below, however, conflates these two distinct elements (and words), leaves no independent role for the second condition, and allows the indemnification analysis to turn entirely on allegations.  That allegations-are-dispositive approach is manifestly unfaithful to the text of the Policy.  And it is also at odds with the traditional rule in Virginia law that "the duty to indemnify" turns on "litigated facts," not on "the allegations in the underlying complaint."  *CACI*, 566 F.3d at 155.

Partially recognizing that problem, the district court insisted that it "does not hold that the Exclusion bars coverage 'for *any* loss arising from a *claim alleging* the receipt of inadequate consideration, even in part.'" JA2960 n.18. As the court put it, if a plaintiff asserted "separate" claims with "distinct theories of harm"—*e.g.*, claims under both §14(a) and §10(b) of the Exchange Act—then a court would have to parse the settlement to determine which amounts actually represent an effective increase in consideration. JA2960 n.18. The court thought that it could avoid that kind of analysis here, however, because "the underlying claims only alleged harm due to inadequate consideration because of the merger," so the settlement payments are "necessarily" excluded from indemnification. JA2960 n.18.

That reasoning is doubly problematic. To begin with, a plaintiff need not incant separate statutes to assert "distinct theories of harm" (and the district court offered no contrary evidence or authority). The Virginia Action itself is a prime example of that dynamic: That §14(a) action involved one theory of harm based on a stock-price-reversion theory (as to which the lead plaintiff's expert actually calculated damages) and another theory of harm based on a merger-consideration analysis (as to which the lead plaintiff's expert did not calculate damages, likely because that theory is not viable under §14(a)). The district court thus should have looked beyond the allegations even under its own theory of the Bump-Up Exclusion, which would have revealed the implausibility of suggesting that Towers Watson paid

$75 million as compensation for a secondary damages theory that the lead plaintiff never seriously pursued.

Presumably, this would have been particularly obvious if this case were litigated all the way to judgment and the plaintiff at trial completely abandoned its merger-consideration theory (which the district court would have dismissed in any event) in favor of a stock-price-reversion theory. In that event, it would be implausible to insist that the judgment amount represented additional deal consideration. But there is no textual basis for distinguishing settlements and judgments, and if the district court had gone beyond the allegations, it would have been plain that the settlement amounts represented the resolution of the stock-price-reversion claims. In all events, the court's explanation is ultimately just another way of saying that the second prong of the Bump-Up Exclusion does no work at all whenever Towers Watson settles a claim alleging inadequate deal consideration, which is Towers Watson's point.

The district court seemed to think that the Seventh Circuit's decision in *Komatsu* supported its conclusion because it involved a purportedly "similar exclusion," JA2960, but *Komatsu* shows all that is wrong with the decision below. Quite unlike the wording of the Bump-Up Exclusion here, the bump-up exclusion in *Komatsu* did not have two prongs. Rather, that bump-up exclusion provided that the insurer need not indemnify the insureds there for "any amount of any judgment or

settlement of any Inadequate Consideration Claim," and it defined an "Inadequate Consideration Claim" as "that part of any Claim *alleging* that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate." 58 F.4th at 307 (emphasis added).

In other words, the bump-up exclusion in *Komatsu* lacked two distinct elements and focused only on the allegations in the complaint—not what the settlement or judgment represents—which is why the *Komatsu* court itself described a bump-up exclusion identical to the one at issue here as "different" from the one that it had considered. *Id.* at 308-09 (discussing the bump-up exclusion in *Northrop*); *see also Northrop*, 2021 WL 347015, at *19. That court below considered the *Komatsu* court's analysis of that bump-up exclusion directly on-point thus is just another data point supporting the conclusion that it impermissibly read words out of the Bump-Up Exclusion here. *Cf. Komatsu*, 58 F.4th at 309 ("Komatsu Mining wants us to proceed as if all D&O policies contain the same language, but they don't, so we shouldn't.").

The district court also thought that its interpretation of the Bump-Up Exclusion is supported by the exclusion's use of the term "paid," which (according to the court) "contemplates that the Exclusion could apply to" "additional monies" "distributed *after* the merger consideration, identified as such, has already been

44

'paid.'" JA2959-2960. That is true, but irrelevant. After all, any "additional monies" "paid" after the consummation of the merger still have to represent effective increases *in deal consideration* as opposed to something else (*e.g.*, stock-drop damages), and *that* is the requirement that the Insurers are unable to satisfy.

The district court's interpretation of the Bump-Up Exclusion is not just atextual but also conflicts with other provisions in the Policy. As explained, other Policy provisions make clear that Towers Watson generally has insurance coverage for "settlements" arising from "Securities Claims" cases that allege "Wrongful Acts" before the closing of a merger transaction. *See* JA1406, JA1416, JA1426-1427, JA1431, JA1482. As is widely recognized, it is "typical[]" for a merger objection to "allege," *inter alia*, that the target company "failed to maximize shareholder value," Daines & Koumrian, *supra*, 1, and merger objections are par for the course these days, *see* Cain, *supra*, 604. But under the interpretation adopted below, Towers Watson's bargained-for coverage is essentially illusory, since it will *never* have the ability to obtain indemnification *whenever* it settles a claim involving all-too-common *allegations* of inadequate consideration. Tellingly, the court below did not suggest otherwise. Instead, it simply observed that Towers Watson would still get coverage for defense costs in merger-related litigation and for "securities claims that arise outside the context of an 'acquisition or completion of [an] acquisition of all or substantially all the ownership interest in or assets of an entity." JA2959 n.17.

45

That is no answer, as defense costs are expressly excluded from the exclusion, and so the language of the exclusion itself would render the express (and paid-for) indemnity coverage of securities claims arising out of mergers and acquisitions illusory. That conclusion runs afoul of generally applicable rules of contract interpretation and the Virginia cases that invoke *contra proferentem* to avoid such illusory coverage. *See, e.g.*, *Seals v. Erie Ins. Exch.*, 674 S.E.2d 860, 862 (Va. 2009); *Hill v. State Farm Mut. Auto. Ins. Co.*, 375 S.E.2d 727, 729 (Va. 1989).

Nor does the district court's exceedingly broad understanding of the Bump-Up Exclusion align with its purpose. As the Insurers told this Court the last time around, the Bump-Up Exclusion is designed to "prevent" the Policy "from being 'used to subsidize a share buy-out transaction on behalf of either the insured company or an uninsured third-party acquirer.'" No.21-2396, Dkt.35 at 33 (citation omitted). To be sure, if litigation is filed before a merger is consummated and results in the deal compensation being increased, that is quite different from run-of-the-mill securities litigation. And a post hoc suit that effectively results in the same recovery—like an appraisal action and certain state law breach-of-fiduciary-duty claims—could reasonably be treated the same way. But expanding a Bump-Up Exclusion beyond those contexts to any suit related to a merger that seeks to remedy damages to shareholders goes well beyond any reasonable conception of a bump-up

or what distinguishes bump-up recoveries from all the other securities litigation that is plainly covered by the policies at issue.

**C. Because Indemnification for the Settlement in the Virginia Action Exhausts the Policy's Remaining Coverage, The Court Need Not Address Whether Towers Watson Is Also Entitled to Indemnification for the Settlement in the Delaware Action.**

As the foregoing demonstrates, Towers Watson is contractually entitled to indemnification for the settlement in the Virginia Action. That should be the end of the road in this appeal: Because Towers Watson settled the Virginia Action for $75 million, and there is only $54 million in coverage left under the Policy, there is no need for this Court to address whether Towers Watson is also entitled to coverage for settlement in the Delaware Action. In all events, the district court's application of the Bump-Up Exclusion to that settlement is equally unsustainable, as it ultimately relied on the same allegations-are-dispositive interpretation of the Bump-Up Exclusion that it applied to the settlement in the Virginia Action. *See* JA2959-2960 (district court applying its understanding of the Bump-Up Exclusion to "the Settlements" collectively).

**II. At The Very Least, The District Court's Conclusion That The Bump-Up Exclusion Precludes Indemnification For Over $17 Million That Went Towards Attorneys' Fees Cannot Remain Standing.**

At a bare minimum, the Court should hold that the Bump-Up Exclusion does not apply to the $17,626,730.78 of the settlement paid toward attorneys' fees. *See* JA1356, JA1991-1992. To reiterate, the Bump-Up Exclusion applies only to the

particular "amount" of any settlement that "represent[s]" an effective increase in the deal "consideration" "paid" to shareholders. JA1427. Attorneys' fees never paid to shareholders are not such an "amount." Rather, they represent fees paid to attorneys for their time and effort in the litigation.

It is indisputable that the shareholders here never received or controlled these amounts. Instead, the Virginia and Delaware courts held the $17+ million "in *custodia legis*" and paid it to the plaintiffs' attorneys before Towers Watson shareholders saw a dime. JA1900, JA2057; *see* JA1863 ("Any attorneys' fees and Litigation Expenses that are awarded by the Court shall be paid to Lead Counsel immediately upon award[.]); *see also* JA2176. Those shareholders were told up front that, if they participated in the settlement, they would only receive the "Net Settlement Fund"—*i.e.*, the amount remaining after payment of attorneys' fees and costs. JA1922-1923, JA1932-1933.

In nevertheless concluding that the Bump-Up Exclusion prohibits indemnification for these attorneys' fees, the district court relied on the "common fund doctrine," *see* JA2960-2961, which is an equitable doctrine that "allows a court to award 'a reasonable attorney's fee' to '… a lawyer who recovers a common fund for the benefit of persons other than himself or his client … from the fund as a whole,'" *Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d 763, 785 (4th Cir. 2019). But this interpretation of the Bump-Up

Exclusion is impossible to square with the Policy's plain language and this Court's prior admonition in this case that courts may not "insert[] terms not included by the parties" in a contract or "assign a specialized meaning to a contract term absent some indication that the parties intended to do so." JA729, JA731. There is no indication in the Policy (or elsewhere) that the parties meant to incorporate the common fund doctrine or have it modify the scope of the Bump-Up Exclusion. The doctrine is mentioned nowhere in the Policy.

As a result, the operative test is still whether an "ordinary person" would conclude that money directed *away* from Towers Watson shareholders nevertheless represents an effective increase in deal consideration *to* those shareholders. JA726-727. No ordinary person would reach such an illogical conclusion, let alone by reference to a specialized legal concept that the Policy does not even reference. If litigation to block an unconsummated merger resulted in a judgment that increased the merger compensation by $1/share and provided for $10 million in attorneys' fees, or if the parties to litigation challenging deal consideration negotiated a settlement payment of $1/share to shareholders and a separate payment of $10 million in attorneys' fees, there would be no doubt that the attorneys' fees do not represent an effective increase in deal consideration. *See Safeway Stores, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 64 F.3d 1282, 1286 (9th Cir. 1995) (insurance policy did not cover portion of settlement that "essentially amounted to

... upping [the] purchase price" in merger, but did cover attorney fees because "[t]he lawyers got the money, not the shareholders"); *Ceradyne, Inc. v. RLI Ins. Co.*, 2022 WL 16735360, at *11 (C.D. Cal. Oct. 31, 2022) (bump-up exclusion did not encompass "the portion of the settlement proceeds that did not 'effectively increase' the consideration paid—namely attorneys' fees"). An "ordinary person" would not reach a contrary conclusion with respect to the settlement here simply because the attorneys' fees were awarded under a common fund rubric.

The district court also suggested that "nothing in the Exclusion itself suggests that it applies only to the net amount that actually reaches the shareholders" and that it makes no difference "how" the settlement money "is distributed once it is paid to the beneficiaries." JA2961. The court erred on both counts. As to the court's first argument, the Bump-Up Exclusion *does* suggest that it applies only to amounts that actually reach shareholders: It limits its scope to amounts that represent an effective increase in "such" consideration, with the word "such" referring to the amounts "*paid*" or proposed to be "*paid*" to shareholders in the transaction. And this limitation is consistent with the *Insurers'* stated purpose of the exclusion, which is to prevent the Policy from being used to "subsidize" a buy-out transaction. No.21-2396, Dkt.35 at 33. Barring coverage for amounts paid to plaintiff's counsel in the litigation would not serve this purpose. *See Ceradyne*, 2022 WL 16735360, at *12.

As to the district court's second argument, the portion of the settlement paid to plaintiff's counsel was *never* "paid" to shareholders, so the court operated from a faulty premise. As noted, these amounts were held in the custody of the court until they were paid to plaintiff's counsel, at which point shareholders received only the "Net Settlement Amount." That is significant because, as the *Insurers* themselves previously urged this Court, it is the "real world" result that matters for purposes of the exclusion. No.21-2396, Dkt.35 at 55. In the real world, amounts paid to plaintiff's counsel do not represent an effective increase in deal consideration to shareholders.

Regardless, even assuming that the Policy *sub silentio* incorporates the common fund doctrine, the application of that doctrine favors Towers Watson, not the Insurers. As this Court has explained, that doctrine reflects the principle that, "when one benefits from a lawsuit without contributing to its costs, he has been unjustly enriched at the successful … lawyer's expense" and that it is necessary to "remedy this inequity by shifting a proportional share of reasonable attorneys' fees onto these unjustly enriched beneficiaries." *Brundle*, 919 F.3d at 785. Put another way, the *raison d'être* of the common fund doctrine is to disabuse non-paying plaintiffs of the notion that everything paid out by a defendant is rightfully theirs. To nonetheless characterize the $17+ million in attorneys' fees—*i.e.*, $17+ million

in unjust enrichment—as an effective increase in deal consideration for Towers Watson shareholders thus gets the common fund doctrine exactly backwards.

At the end of the day, the district court's holding that the attorneys' fees component of the settlement represented an effective increase in deal consideration "paid" to shareholders improperly grafted an extrinsic legal concept onto the Policy and subverted how an "ordinary person" would understand its plain terms.[8] Accordingly, at a minimum, Towers Watson is entitled to indemnification for the $17+ million in attorneys' fees.

---

[8] Towers Watson's position that attorneys' fees that are never paid to or controlled by shareholders do not represent an effective increase in deal consideration to those shareholders is at least an "equally possible" interpretation of the exclusion—and thus controls. *See PBM Nutritionals*, 724 S.E.2d at 713.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment.

Respectfully submitted,

ROBIN L. COHEN
ADAM S. ZIFFER
ORRIE A. LEVY
COHEN ZIFFER FRENCHMAN
 & MCKENNA LLP
1325 Avenue of the Americas
New York, New York 10019
(212) 584-1890

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
ANDREW C. LAWRENCE
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

*Counsel for Appellant*

July 12, 2024

## STATEMENT REGARDING ORAL ARGUMENT

As it did in the first appeal in this case, Towers Watson & Co. respectfully requests oral argument.

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,085 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

July 12, 2024

<u>s/Paul D. Clement</u>
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 12, 2024, I electronically filed the foregoing with

the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit

by using the CM/ECF system.  I certify that all participants in this case are registered

CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement